Andy, in terms of geography, is it referred to as Bering Straits or Bering Strait? The party is Bering Strait. You know, I've heard it both ways. I have no idea. People just say both. I guess there's one strait. The Alaskans say Bering Straits. I don't know why. There's really only one strait. I thought it was straits when I represented that region. Did you represent that region? Yeah, I did. Did you call it straits or strait? I thought it was straits. My memory might be wrong. We're chatting here over whether locals call it Bering Straits or Bering Strait, and we can't remember. I always talked about the Bering Sea. That's different from the strait. The Bering Straits, if they are straits, in between Russia and Alaska, adjacent to where the Bering Sea ends, I guess. We're ready, counsel. Good morning, Your Honors. May it please the Court. My name is Brian Litmans, and I represent Bering Strait citizens in this case, along with Ms. Victoria Clark. This case concerns the Army Corps of Engineers Section 404 permit for Alaska Gold's construction and operation of the Nome region's first open pit industrial gold mine. Wait a minute. First? That's right, Your Honor. It's on the Snake River, right? It's in the Snake River watershed along the Snake River, yes, Your Honor. And the Snake River is just a little bit west of Nome. That's right. And there are numerous photographs of the extensive industrial mining activity on the Snake River that go back almost to 1898. You're correct, Your Honor, in that there's been mining in this. These could be trick questions. From Judge Kleinfeld, these could be trick questions. Well, Judge Kleinfeld, that's right. There's been mining in the Nome region and in the Snake watershed for over 100 years, but that mining pertains to small-scale plaster mines. And in this case, we are discussing and reviewing a permit for the first large-scale industrial open pit gold mine, utilizing cyanide, multiple facilities, destruction of 340 acres of wetlands. When I read the record in this case, it looked to me a lot like the Fort Knox gold mine, where there had been small gold mines for a century and more, and the feds grant a permit for a large open pit mine because the company is going to have the money to do reclamation that has not been done in 100 years on all those old mines. It looked like that's what was going on here, wasn't it? Well, I cannot speak to the Fort Knox mine. It's not at issue in this case. At issue is the Rock Creek mine. Well, speaking about this, there's two sites at issue in this permit. The Rock Creek mine project includes two open sites. It includes a large 50-acre open pit in the Snake watershed. That's the Rock Creek mill site. And then there's also a site up in the Big Hurrah, 40 miles down the road, and in that area there is old mining impacts from plaster mines that will be reclaimed as a result of this permit. Is it true that both sites are in areas that have been heavily mined since the Nome gold rush, which started in 1898, and is it true that part of the plan for both is reclamation, which the government will secure? The government certainly, or rather the U.S. Corps of Engineers, heavily relied upon mitigation in approving this permit with respect to the Rock Creek project itself. We take dispute with the state in which this area is characterized by the Alaska Gold Company as well as the U.S. Corps of Engineers. While there has been long-term mining, small-scale plaster mining, that impact is much smaller compared to what we're looking at today with the Rock Creek project. Why assume that? Usually small-scale leaves a big mess because they can't afford to reclaim, and the big mines reclaim and you get something other than tailings after a few years. Well, while certainly there may be issues with respect to the size of a company and how well it can throw in resources to reclaim a project, the actual footprint and environmental impact of a small-scale plaster mine is significantly different than the Rock Creek project. During the gold rush, no one had to post a reclamation bond, but now they generally do. Bonds are required. Most importantly in this case, under the Clean Water Act, there's a strong presumption against the fill and destruction of wetlands. It's a part of the 404 permit. I thought part of the plan here was that the fish would actually have a better habitat because of the reclamation of the Snake River by the mines. There are certain statements as to the impacts of mitigation through this project. For the most part, a lot of the mitigation pertains to the Big Hurrah site, and there are also questionable impacts as to how the mitigation will, whether or not it will have impacts for fish as well as other wildlife. In fact, there are significant questions with respect to mitigation that were raised by the U.S. Environmental Protection Agency who has oversight with respect to 404 permits. However, I'd like to take a step back from mitigation and address how you get to mitigation. And you don't get to mitigation until you first address whether or not the chosen action alternative is the least environmentally damaging. In this case, we have a non-water-dependent project. The Clean Water Act then requires, if that is the case, that the Army Corps, as well as Alaska Gold, bear a strong presumption against the fill of wetlands. And to do that, they must find the least part of it. You say fill of wetlands. I'm sorry, the discharge of dredged material into wetlands. So it's not fill. I'm sure you've been up there many times. It's tundra, not swamp. Isn't that correct? That is correct. It's watershed with tundra. And unfortunately, I have not been able to get up there because my client does not have the resources for that type of trip. However, with respect to the Clean Water Act's requirements as to avoiding impact to wetlands and discharging into those wetlands, in that case, we have contention that the Corps has not met its heavy burden. I thought tundra, even though the water is in a frozen form, is still wetland. Yes, Your Honor. Is that right or wrong? No, that's correct. I thought all the tundra just about in Alaska was a whole lot of wetland. There is significant wetlands in the state of Alaska. Pretty much all the tundra counts, right, in Alaska? There is upland tundra. I could be incorrect in my geological characterization. Everything from the fall line of the Brooks Range counts as wetlands. I'm sorry? Everything from the fall line of the Brooks Range counts as navigable waters of the United States. Could you recharacterize that? Maybe I didn't follow. From the fall line of the Brooks Range, that means the part of the mountains where any water, when it's liquid, will run north rather than south. Well, that would be the delineation of the watershed. I think that would be a different characterization compared to what the wetlands are. In this case, as I understand it, the impact is to less than 1 percent of the Snake River drainage and two ten-thousandths of a percent of the Alaska wetlands. Do you have anything in the record that contradicts that? Your Honor, we do not take contention with the percentage of wetlands at issue compared to the state of Alaska. However, the question is not the Snake River. I'm sorry? We take no contention with either of those percentages. However, neither of those percentages have any impact in whether or not the courts complied with the Clean Water Act. Specifically, it must look at the site-specific impacts and determine whether or not the project complies with several of the 404b1 guidelines. As I alluded, the first major problem with this permit is that they failed to implement the least environmentally damaging alternative. There were three ways in which it could have done so. They pertained to dry stack tailings, co-disposal, and location of a north dump. I was worried about your suggestion that they didn't give enough consideration to the uphill dump. I was thinking, what a colossal danger to anyone running a piece of heavy equipment down the hill. Vibrations might cause the uphill dump to tumble down the hill on you. Well, why should they have given more consideration than they did to that possibility? We contend that the Corps has not evaluated any of these potential alternatives to either determine safety aspects, but more importantly with respect to the Corps' obligations under the Clean Water Act, whether these alternatives would in fact, or excuse me, are in fact, one, less environmentally damaging, and two, practicable. We contend that they are, and as AGC, excuse me, Alaska Gold, as well as the Corps, have acknowledged with respect to some of these alternatives, they are less environmentally damaging, but then there become questions as to the practicability. However, nowhere within the record within, for the permit and inside the EA, environmental assessment, is there a discussion, a meaningful discussion that meets the Corps' burden to demonstrate why these actions that were presented in the briefing before you and were before the Corps, why these three alternatives were not the least environmentally damaging practical alternative. They discussed them. Your argument is that it's not meaningful. So how about showing us the pages and showing us why it's not meaningful. With respect to the dry stack tailings alternative, I can cite to page 321 of the EA. It has a table of summary of alternatives. The discussion is 3.2.4, tailings storage facility, pays tailings, accept it, reduces footprint. The discussion, paragraph discussion that follows doesn't provide why dry stack tailings is not practical. Alaska Gold has presented that it's cost prohibitive. However, there's nothing in the record to demonstrate why, in fact, it is cost prohibitive. Could you refresh our recollection on what dry stack tailings means? I'd be happy to, Your Honor. There's multiple ways in which the mining company can handle the tailings, and tailings are the byproduct after the rock has gone through a chemical process, in this case involving cyanide. Pays tailings is dry stack tailings, rather, involves further dewatering of the tailings, so there's not as much material. And as a result, in this case, dry stack tailings would have resulted in 6 million less tons of waste material and would have had a reduction of over 558,000 square meters of wetlands disturbance. Counsel, am I correct in thinking that we don't currently have any Ninth Circuit precedent like assessing what is meant by the phrase least environmentally damaging practicable alternative? I couldn't find the Ninth Circuit case on that standard. If I'm missing one, why don't you let me know what opinion we've rendered on it. If not, I guess we go to our normal tools of interpreting statutes and regulations. But have we opined on that phrase? I have certainly thought of that phrase. I think with respect to some of the alternatives present in this case, that question is not necessarily before us because the record reflects that alternatives that were before the project, that were before Alaska Gold for consideration but were not considered in detail either by Alaska Gold or certainly not considered by the U.S. Corps of Engineers, those brief summaries indicate that an alternative, such as a dry stack alternative, would have less impact on wetlands. And as a result, it becomes the less environmentally damaging alternative of the two. It has less footprint. Right. But the word practicable is in that. It is, Your Honor. And I think the contention then becomes. Do you have a Ninth Circuit case that analyzes that? I cannot refer you to a specific case that would highlight what is and isn't practicable. The regulations provide certain terms that go to what practicability is, referring to cost, the technological feasibility, and logistics. And the company as well as the Corps are supposed to consider those in determining practicability. And I'm sorry. Before you use all your time up on the alternative, I was hoping at some point you would address the procedural question, whether a draft EA has to be circulated. Of course, I was on the Anderson panel where we said that in dicta. But I understand there's another circuit court opinion that goes the other way on whether a draft EA has to be circulated. So I hope you'll address that and also address whether there was adequate  Certainly, Your Honor. If I may address the latter question first with respect to cumulative impacts analysis. The Ninth Circuit has set out in a series of cases what is required for a cumulative impacts analysis. Those analyses must provide quantified and detailed information. In this case, we feel the 2007 EA is deficient in two regards. First, the cumulative impacts analysis must consider the impacts across the Nome region. We feel it has failed to provide the proper scope within its analysis and has failed to take into account the impacts that this project will have by using a port in Nome and the associated uses with that. Secondly, we feel that analysis is deficient because it identifies 50 placer mines, projects over a five-year period affecting 500 acres of wetlands. Yet there is no list of those projects as has been set out in Klamath Siskiyou Wildland Center, Lands Council v. Powell, and specifically Great Basin Watch v. Hankins. Counsel, I'm confused about something here. Yes, Your Honor. On what you just said on the cumulative impacts. Usually when we get cumulative impact cases, it's about the Forest Service allowing logging. The Forest Service allows logging on some portion and has a pretty good argument for why logging of that area of woods won't, why they've given the environmental considerations a hard look and it won't be adverse. And then we sometimes reverse. We say you haven't considered the cumulative impact of the other logging permits that you've granted in the surrounding area. In this case, though, I don't see where there's identification of the other permits granted. When you say cumulative impact, you have to ask what is it that you're accumulating. And mostly it's just open tundra in areas that have been mined for 100 years. And I'm not aware that there are a bunch of other projects. It looks like just a spot on the tundra that's largely otherwise wide open. A lot of unemployed people. I understand the native corporations really want this to go forward. They all signed on. Cumulative to what? Well, I think the purpose of a cumulative impacts analysis is to determine all of the cumulative impacts associated with the project. And because there's not a meeting. It's usually cumulative of multiple permits. It could be cumulative impacts associated with other projects, other actions. What other federal actions? What other projects are you talking about? All I know, Your Honor, is that the Corps identified 50 plaster mines affecting 500 acres. I'm sure there are other mines, but that doesn't mean that there's anything new about the permits. A lot of that land became private because of mining claims that were filed during the Nome Gold Rush. A lot of them were written about in Rex Beach's novel, The Spoilers. These are all just basically private property. Certainly, Your Honor. Cumulative impacts analysis must assess the entire scope, private and federal property. And so in this case, they need to look at the cumulative impacts of all the projects. It doesn't focus specifically on a permit. What other projects are you saying are combined with this action by the Corps? Have a cumulative impact. Certainly. Unfortunately, the record is deplete in this regard, and we don't know the product. If you want to say, if you want to make a cumulative impact case, wasn't the burden on the plaintiffs to show us what it was that was to be accumulated? Cumulative impact of what? The burden rests on the Corps, Your Honor, to provide a NEPA analysis that demonstrates its findings. In this case, there's no demonstration that it's cumulative impacts analysis, that the impacts associated cumulatively are not significant. They've identified 50 projects, but they provide no quantified or detailed information. Great Basin Mine Watch, in that case, there was several mines in the area. They provided a list, and the court found that that list was insufficient because they didn't know what the associated environmental impacts with those other mines cumulatively with the project at issue were. In this case, all we have is the brief statement saying 50 plaster mines affecting 500 acres. No list. We don't know when these mines did or did not take place. We don't know the scale. We don't know the scope. We don't know the environmental impacts associated with each of those projects. So it's impossible for the Corps to then make a finding of no significant impact and simply state there are no cumulative impacts. We've looked at it. Here's our simple statement concluding, without demonstrating in the record why that is the case. I see my time is almost up. I think that Judge Gould had another question. He certainly did, Your Honor. Well, I think in the Evans case, where Judge Berzon wrote part of the opinion on NEPA, and I authored a part of the opinion on the Marine Mammal Protection Act, but joined her NEPA analysis. There was a sentence saying that EISs and EAs have to be circulated in draft form. And when that sentence is in there, it's cited the reg that says EIS documents have to be circulated in draft. In that Anderson case, we didn't really have an issue about whether an EA had to be circulated in draft form. I think in that case it was circulated. So the legal issue presented here, I think, wasn't there. And so that was a dictum. So I've been trying to figure out if that should be the rule of law or not. And I understood there was a circuit on the other side of that. So I was hoping you, just starting on first principles, would give me your best argument on why you think an EA in draft form has to be circulated, which is in your briefs. But I don't know if you have anything to add. I believe it's fully explained in our briefs. I would just highlight that while the regulations don't explicitly require that a draft EA be circulated, that even in Sierra Nevada Forest Protection Council v. Weingart, where the district court said that while Citizens for Better Forestry and Anderson v. Evans had dicta with respect to whether or not a draft EA be circulated, in that case they said a draft EA does not need to be circulated, but they did opine that significant pre-decisional opportunities for informed public involvement be placed forward. And in this case, we feel that there is no public process, especially with respect to the 2007 EA, where in 2006 they issue an EA and permit for these action, bearing straight Citizens, sues, and the Corps pulls the permit. Three months later, the Corps comes back with a new EA and a new permit. Yet in that time, there was no public process. There was no opportunity for comment, let alone a draft EA to be circulated, and this in light of the fact that the Corps had acknowledged deficiencies in its original 2006 EA. It acknowledged that there was problems with respect to the alternatives analysis, and it tried to overcome them in a post hoc rationalization, in a post hoc effort, but still provides no public process. So we feel even if you just look at the 2007 permit and EA, no public process, and as a result, there's no meaningful opportunity for public review. So even if we do not get to the point where a draft EA is absolutely required in all cases, we feel that this public process was insufficient under NEPA. And with that, I see heavily beyond my time. Thank you, Counsel. We took you over. Even though you're way over time, we'll give you one minute to rebut. Thank you very much, Your Honor. Counsel? Good morning. May it please the Court. I'm Ryan Nelson on behalf of the U.S. Army Corps of Engineers. I will take 13 minutes, and Mr. Grisham will take seven minutes. After nearly 60 meetings, over three years, numerous revisions to the permit proposal, a public comment period, and the imposition of 13 special conditions aimed at adopting significant mitigation measures, the Army Corps of Engineers issued a permit for Alaska Gold Company to fill wetlands for gold mining operations. The mining was located on private property, including leased property from native corporations that had been specifically designated for mineral resources and land which had been mined heavily for over 100 years. Ultimately, less than 1% of the Snake River watershed, the waters of the United States in that watershed, will be permanently disturbed under this permit, and it's also true. And this is relatively important that 81% of the wetlands at issue here have already been disturbed. What mainly remains to be done is the mitigation measures, which will mitigate 170 acres of wetlands, either create them or restore them. So the district court appropriately held that the Army Corps of Engineers complied with both the Clean Water Act and with NEPA, and it should be affirmed. How about if you give me your best argument on the issue of whether an EA has to be circulated in draft form and address appellant's argument that there wasn't adequate tendering of the issues to the public? Sure. That's a total red herring in this case. No court, including this court, has ever held that a draft EA has to be circulated. I understand that, Judge Gould, you were on a panel that had a statement in dicta, but just three weeks ago a district court below confirmed what virtually all district courts have held in this circuit, which is that that is dicta and that's not what's binding. I think I said I thought it was a dictum, but so we now as a panel have the issue tendered to us, so we have to decide it. So what is the best argument that you make that it's not required? Well, plain language of the regulations is the best argument that we have, and that's the one that's been adopted by the First Circuit, the Eleventh Circuit, the Second Circuit, all the other courts that have looked at this. That is that an EA is a concise statement and the regulations require public involvement. That's the specific term that's used there. Now, there's a separate regulation, both from CEQ and that the court has adopted, which specifically requires public comment on a draft EA, and that's addressed at footnote 9 in our brief, but those circumstances are not at issue in this case. Now, contrast that to the language of a draft EIS. The NEPA regulations are very clear that a draft EIS must be circulated and have an opportunity for comment. So that's the plain language argument. Now, I guess the question here is you withdrew the permit and then you reissued it. And did you get adequate public comment before you reissued? I guess that's where the question is in my mind. Well, I don't think there can be any serious contention that there was adequate public comment here. Plaintiffs themselves submitted an 18-page response to the permit application. They had all of the environmental information. This was after the permit was withdrawn and before the new one came out? I'm not exactly sure at what point those comments were submitted, but there was additional opportunity for all parties to make comments on the process. The permit was withdrawn. Sure. So did they say now we're proposing to modify it in these ways? What do you think about it? There wasn't any of that, I guess. No, there wasn't any of that, and none of that would necessarily be required. But what is true is that the Army Corps of Engineers took into account all the public comments that had been received. Before, and they tried to address them, I gather. Well, yes, that's correct. And that ultimately resulted in a 51-page environmental assessment that walked through specifically each of the comments received from each of the agencies, from each of the individuals, including the appellants in this case. And, Judge Gould, let me just make one final comment, to the extent that this is still concerning to you, on the public comment or the circulation of the draft EA. The important point under the NEPA regulations is that the material be out there. And that's what the regulations speak to, is that the documents are out there. There's no question in this case that those documents were available. The plaintiffs cited to the environmental information documents. There was a multi-volume set. This was widely publicized. A year and a half of weekly articles were put in the local newspaper, notices at the public library. It can't seriously be argued that the information wasn't out there. And I'm not necessarily concerned, you know, with a position on that issue. I just feel that our panel is going to have to decide it. I wanted to make sure I had your argument. How about cumulative impacts? Absolutely, Your Honor. You've actually just heard some of the statements on what the cumulative impacts analysis is. If you turn to page 1772 and 1773, which is volume 7 of the supplemental excerpts of record, walk through a two-page analysis of cumulative impacts, which also incorporates at 373 through 378 of the supplemental excerpts of record an additional eight pages of analysis on the cumulative impacts. It's not accurate to say that we didn't, that the Army Corps did not consider what the cumulative impacts here were. They noted that in the last five years there were 50 placer mine applications. And if you go back to 373 through 378, it outlines that even further. And the case law is very clear that the Army Corps of Engineers is entitled to rely on this information. And if you look at specifically 374 of the record, it talks about, as of 2005, there were only 11 placer mining operations that were ongoing. If you look back at the Corps' main document, it says specifically from these 50 placer mining operations, approximately 50 acres of placer ground has been mined and reclaimed during this time frame in these watersheds. It tells how many were done. It tells what the impacts were, which is very minimal, because the placer mines, they were both mined and reclaimed, and it tells the time frame. That's what was required in land council, and it's also important to note that after land council, CEQ has put out guidelines in 2005 that says you don't have to provide a specific listing of every single, in this case, mining operation that would be ongoing. But it doesn't stop there. The cumulative impacts go further. It analyzes, okay, what's going to happen in the future. We fully understand that Alaska Gold and possibly others are still out there looking for additional mining operations, and it analyzes that potential. And if you keep reading on 1773, it says, you know, there's the possibility that this mine will be extended from 4 to 5 years, possibly to 7 to 10 years. But even if additional mines are found, it's not likely to go forward at the same time, because the mill would only be able to handle the material from one of the mines at any one given time. So if a new applicant comes in, and mind you, there are no pending applications right now. If a new applicant comes in, then the U.S. Army Corps of Engineers and its cumulative impacts on that permit application will have to include an analysis of this mine. But the cumulative impacts here is very strong. It analyzed as much as this Court has required, specifically under, you know, case law. I think, Judge Gould, you were on in Native Ecosystems, if I'm not mistaken, just a couple of years ago. So I think the record more than adequately supports the cumulative impacts analysis. Counsel, something that has been concerning to me, there's the contention that you haven't considered all of the alternatives, and particularly the various technology alternatives. We have this new case, Southeast Alaska Conservation Council, which I'm sure you're aware of, which puts a slightly different spin on what's practical and suggests that with a high price of gold that it's possible to use more expensive technology and still have it be practicable. Is that something that needs to be considered in this case? Judge Fletcher, it does not need to be considered in this case. You heard in the opening argument regarding the alternatives that they're concerned with dry stacking. Isn't that what they said could go forward in this Southeast Alaska was dry stacking? Well, but it's a different case there. This isn't so much a technological problem as it is a terrain problem. And bear in mind, the original application was for wet tailings. And there's kind of, if you look in the record, there's four alternatives. Two of them are considered the wet tailings. Two are considered dry tailings. What was adopted here, the paste tailings, is almost the same as a dry tailing. It's 75 percent non-water, whereas dry stacking is, I think, 82 percent. Very minimal when you compare it to the 25 percent to the 35 percent. But there are some environmental harms from the pure dry stacking. One is it can't be put up as steep because it is so dry. There's a possibility that the wind will blow it because it's actually too dry. And the Army Corps looked at that. The Army Corps analyzed these things and said that the $8 million additional expense that would be required. And the Army Corps is fully entitled to consider those costs under the Sylvester case in 1989. But when we look at this, they say that those figures are wrong because the price of gold is going up so much. Well, I don't think it's fair. Let's bear in mind, even without the additional cost, we've still got some problems with the dry stacking. There's a very marginal benefit. If you look at the maps in the record, I believe it's 1709 and 1710. I could be wrong about that. No, I'm actually right about that. But if you look at 1709 and 1710 that compare the dry stack tailing to the paste tailing, the impact is very minimal. I understand that it's actually less than one acre of wetlands. I mean, we're not talking about a lot of impact there. For the additional cost and the additional environmental harm, it's just really not worth it. The Army Corps, again, it's, you know, is there substantial evidence that supports their analysis here? And there definitely is substantial analysis. And I would refer the Court to the Army Corps. Are there harms associated with the dry stacking as well as benefits? What's that? There are harms as well as benefits associated with the dry stacking? Yes, there are. And those are addressed. Let me get you some record sites for you. Those are addressed 1352 through 1366, 1695 through 1712, which is the tailings alternatives, a very good report done in 2004, 682 through 694, which addresses all the alternatives. Mind you, 24 alternatives were analyzed here. That's pretty unprecedented. This Court's going to have a hard time trying to find a case that it can distinguish where 24 separate alternatives were analyzed. I suppose there's an alternative that you can't do it at all. Well, there is an alternative that you can't do it at all, and that was looked at. But, I mean, that's the analysis. If this Court wants to come in and just say we're never going to allow gold mining in Alaska, well, that's one. But I don't think the Court's entitled to do that. Counsel, as I understand it, this is not mining in wilderness. This is mining over previously mined properties. That's exactly right. Is there a reclamation aspect to this project that will leave the property worse off, the same, or better off than it was before in terms of the environment? The Army Corps found that the property would be better off. The Hurra Creek, which now has totally been changed. It has tons of tailings from not just the placer mining that counsel would have you believe. There was dredging that was going on here in the 1920s and 1940s that is still the harm is still here. And they're cleaning that all up. They're restoring the Hurra Creek so that it will go back to its pristine condition as it once was. And that's the important thing here. Without these mitigation measures, there's no question that this would probably not have been approved. But the mitigation measures here are strong. They're significant. 106 acres of wetlands will be created that didn't exist before. 70 acres will be reclaimed. Bird habitat will be included. Fish habitat will be included. All of this was analyzed by the Army Corps of Engineers. I'm unclear on my time here. You're over. Okay. So with that, I will turn the time over to Mr. Grisham. Thank you, counsel. May it please the Court. My name is Michael Grisham. I'm here representing the Alaska Gold Company, who is the permittee at issue with this mine. I have no doubt that the Court will feel free to interrupt with questions with respect to what interests you. But the first thing I wanted to address is a question that's to see if the Court is interested in hearing about the present status of the project. This is not reflected in the record, nor could it be since mining has been ongoing. If the Court is interested in hearing about this, I could give you information on it. If not, I'll move on. If anything is mooted out about the case, it would be nice to know. Otherwise, I don't think it would affect anything. Well, that's actually an interesting question, Your Honor. During the suspension of the previous permit, the Army Corps of Engineers determined that work could continue to go forward at certain portions of the site, because those portions were determined by the Army Corps of Engineers to be no longer waters of the United States, no longer wetlands subject to their jurisdiction. So as we've raised in our briefs, there is a significant issue with respect to what the appropriate scope of any injunctive relief could be in this case. Harmless error analysis generally applies, and a lot of these areas, due to the delays in filing their lawsuit by the plaintiffs and the delays in refiling their lawsuit after the suspension, a lot of these areas are likely no longer wetlands, and in point of fact, the harms have likely been fully visited upon them. So there is a real issue. I guess the issue then is whether it could be restored or whether or not to be restored. So I don't know whether this is something we want to even think too much about right now. No, Your Honor. We don't think that the Court has an appropriate record before it to actually consider these issues and believe it should be remanded to the district court should that become an issue, because the district court would have to develop such a record. Other than that, one of the significant points that's easy to gloss over when you're dealing with highly technical statutes and regulations such as are at issue here is the issue of context. Now, this is actually central, though. The overall context, the big picture of the project, is central to a NEPA analysis and it's also central to a Clean Water Act analysis. NEPA requires under 40 CFR section 1508.9 a finding of no significant impact. It doesn't say that no impacts can take place. It says there should be a finding of no significant impact. The same is true of the Clean Water Act at 40 CFR section 230.10, a finding of no significant degradation. And, of course, under the Clean Water Act, the Army Corps of Engineers has to determine where the public interest lies. All of these issues necessarily take into account the context within which the project happens. And there are unique contexts here, specifically the historical context, the environmental context, and the socioeconomic context that the Court did have to consider. It's kind of interesting why you didn't just proceed with an EIS or the Court didn't, because when you say that there's got to be a very substantial mitigation has been ordered, it means that there must have been what would be considered significant impact to require significant mitigation. And you get to the point, well, maybe this mitigation is so great that you're improving the land rather than destroying it. But it seems you've got a significant impact one way or another. Well, first of all, I'm glad you asked that question. First of all, an environmental impact statement is not about determining well, pardon me. An environmental impact statement is about studying potential impacts when they're unclear. Yes, absolutely. And we're not dealing here with some sort of slapdash job that the Army Corps of Engineers put out at the end of a very brief process. There's a 16-volume environmental information document that was prepared over the course of three years by Alaska Gold and its environmental consultants. It just maybe stands out loud, then. This is so important that we're doing all these volumes, so why don't you call it an EIS and go through the few extra steps that are required? Well, there's a lot of reasons for that. First off, because an EIS is not necessary. We know what the impacts will be. This is not a controversial project in the Nome area. There are plaintiffs. That's true. It's not necessarily hard to find plaintiffs. But I think the administrative record that you have before you demonstrates significant public support for the project that permeates the area. And, again, because of the environmental information document, we know what it is. So there's no real reason to go forward with that. And it's not a small deal. You can't just rubber stamp an environmental information document and call it an EIS and move ahead. What we're talking about here is a massive undertaking. Preparation of an environmental impact statement by the Army Corps of Engineers will require a dedicated team from the Army Corps of Engineers devoted solely to this project. They'll be involved on it for nearly a year, if not more. And they will be required to move forward with this project to the exclusion of other projects that they could possibly be working on. And it will require an enormous expenditure on the part of Alaska Oil Company. I don't think that's a proper consideration, is it? Either the project has significance, which requires it, or it doesn't. That's not true, Your Honor. The issue is what the end result is. And the issue is whether there is a specific right here. The issue is whether there is any substantial evidence in the record supporting the Army Corps of Engineers finding of no significant impact. And what I was talking about earlier with respect to context goes directly to that, the historical context. Significant past mining impacts on this site that involve not just friend little placer mines and a couple of guys with shovels, but rather involve massive industrial dredges and the waste products that have been dumped. Counselor, I've been in that area several or in the Nome area several times, but I don't know if this mine is in the areas I've been to. There are areas there on that peninsula that are just covered with dead equipment, even old railroad trains tumbled over in the tundra, barrels of who knows what. Was this all mined over in piles of tailings? Is this that kind of area? We believe that the record supports that. That's pretty much the nature of this site. If you look at the environmental information document at Supplemental Excerpt of Record, pages 374 and throughout that area, pages 425 through 440 of the Supplemental Excerpt of Record have photographs. Say those numbers again. The Supplemental Excerpt of Record, pages 425 through 440, include significant numbers of pictures of the site and visual demonstrations of the impacts that were there and also the discussions in the environmental information document regarding past, present, and recently foreseeable actions surrounding page 374 of our Supplemental Excerpt of Record and the other documents that were cited in our briefs. It's been significantly established in that area that there has been a tremendous amount of impacts. I couldn't find it when I was looking for the stuff to take with me on this trip. After the argument, would you check with the clerk's office, just make sure everything got filed properly? I will, Your Honor. I am out of time. There were several other issues. I think you're out of time, but I'd like you to answer one question. So probably Judge Kleinfeld and Judge Fletcher will indulge me. I'd like you to address the cumulative impacts issue just briefly. Yes, Your Honor. First off, I defer mostly to Mr. Nelson's excellent arguments on those issues. The cumulative impacts analysis deals, the cases that were cited by the appellants herein, dealt with projects that were of a similar nature, and it had lists of these projects. And what you have here, this is presently the only project of this nature in the area. So if you want a list of the projects of this nature and the potential impacts of those projects, this is it. Here's your list. And if you want to talk about the placer mining projects, they are different in kind and different in kind in a way that's actually of substantive significance here. They are permitted by the Environmental Protection Agency and by the Corps of Engineers, and they generally take place within stream beds. And what the Army Corps of Engineers specifically found here is that these projects operate and are reclaimed on a rolling basis so that the cumulative impacts of these over time is essentially nil. They specifically considered all of the projects in the area over time. It said that there were 11 open at the time. It did not expect those to be, to have any specific cumulative impacts at all. So we're not dealing with a situation where the Army Corps of Engineers did not consider these things and where there's no substantial evidence of their consideration of these things. The question is, do you think it's an abuse of discretion for them not to have written out a specific list? And I don't believe that that could possibly be the case. The other issue with respect to cumulative impacts that was raised was that there was no discussion of impacts on the port of Nome. And I'd remind the Court that what we're dealing with here is gold. We're not going to be shipping out massive amounts of gold and needing new barges and port facilities or anything else. In fact, it's likely that this gold will be shipped out on a periodic basis, if they're lucky, in a small valise on an airplane that will likely be handcuffed to somebody's wrist. This is not a project where there's significant port impacts. This is a modern mine. No mayonnaise jars. I don't believe so anymore, Your Honor. But at the same time, potential port impacts were discussed in the record. And if I can find a specific site for you. I don't believe that it's in our excerpt of record, Your Honor, but it is in the administrative record, because due to the simultaneous briefing, we weren't able to address all the specific arguments. The cumulative impacts analysis discussing that port appears in the administrative record at pages 484 through 490. I would greatly like to address the issues of the dry stack, but I don't believe I have time. Thank you very much. Thank you, counsel. I think plaintiff's counsel went over, but I said we'd give you a little time anyway. I can just run through a few issues briefly in one minute. With respect to the EA and the public process first, trustees' comments were submitted in 2000 with respect to the 2006 EA, and that's at ER 232. The 2007 EA walks through the 06 comments, but as I alluded to before, there were no comments taken over the 07 EA. Finally, with respect to that, as to whether or not there was a meaningful opportunity for public involvement, it's not just about the documents before the commenters. Alaska Gold heavily relies upon Sierra Nevada Forest Protection Council, and in that case, they noted that, quote, unquote, sufficient environmental information about various topics that the agency must address in the EA, such as cumulative impacts before the EA is finalized, must be available. And that's at 376 F sub 2D at 992. That wasn't the case here. All the commenters had at the very beginning in 2006 was public notice of an application, not even notice of the permit or what the Corps was thinking. We have the plainest citizens had no idea as to what the Corps' analysis would be or what the Corps thought of the Alaska Gold project. With respect to the cumulative impacts, the council for the Corps noted that it was 50 acres. In fact, the EA asserts that it's 500 acres. With respect to the alternatives. Cumulative impact, they say this is the only project there is like this. There's nothing to accumulate it to. Is that true? That statement is not there, Your Honor, as far as I can tell. With respect to the alternatives, it's not a question of the percentage of water in the tailings. I didn't ask you if that statement was there. I asked you if that was true. That there are other mining projects? Words are conflicting. I cannot answer that question because it's not in the record for me to verify whether or not there are or are not other projects. And anything offered here is just a post hoc effort on behalf of Alaska Gold to demonstrate that there are no cumulative impacts when that analysis must be in the EA itself. As for the alternatives, it's the record. Does the record show any other pending projects at developmental stages? Not that I'm aware of, Your Honor. Does the record show any comparable projects that are ongoing, pending, anything to be cumulative to? Not that I'm aware of, Your Honor. The cumulative impacts analysis is brief. It identifies 50 placer mines over 500 acres, and I do not believe it adequately addresses issues with respect to the known port. Anything offered by Alaska Gold was more post hoc rationalization. How do you respond to the argument just presented that on the placer mines, they are required by their permits to do reclamation, I guess, as they go along, so that there's no impact? Yes, Your Honor. With respect to mitigation, first and foremost, the Corps bears a strong presumption under the Clean Water Act and bears a heavy burden to first avoid impacts to wetlands. It's failed to do so by adopting the least environmentally damaging practical alternatives. As a result, mitigation cannot even be considered because it has failed to implement the least environmentally damaging practical alternatives. But if the impact is positive instead of negative, I mean, it looks from the record on this project as though it's they take the gold out, which finances all this, and then they restore the property so that it's better than it's been for the last 100 years. There are references to the fact that the Corps believes certain mitigation efforts will reclaim past impacts to the landscape. However, the majority of the mitigation is in Big Hurrah, whereas the majority of the wetlands destruction is in Rock Creek. There's no analysis that bridges those two gaps. Furthermore ---- There was a question that Judge Gould asked you, and I didn't think he properly answered. As to the placer mining permits, are they required to restore always? I'm not familiar with all placer mining permit requirements, Your Honor. Is that in the record somewhere? The requirements under placer mining? Not that I'm aware of, Your Honor. One last thing with respect to the mitigation. Pretty much all their permits now, all their MPDES permits, require reclamation and restoration? I'm not familiar with the placer mining requirements. I cannot speak to the Clean Water Act obligations for permittees with respect to that. In the record, when the Corps is talking about cumulative impacts, do they make that statement that the placer permits require restoration and there's actually no impact? To my knowledge, the cumulative impacts analysis with respect to the impacts associated with placer mining simply states that there's 50 placer mines affecting some 500 acres and makes no statements as to mitigation or other ways in which those projects have in the past or in the future will be mitigated. Finally, with respect to mitigation, I realize I'm over time. I'd just briefly like to mention that in January of 2007, EPA again identified concern over mitigation and found that because special conditions 4 to 7, that they did not comply with the 404B1 guidelines and that specifically without this information, the project cannot be evaluated for compliance with the guidelines. And as a result, we're relying on speculative mitigation with respect to some of these things that the EPA said, if it's not there, you're not complying with the 404B1 guidelines. And there's still yet to be any site-specific mitigation plans  Finally, I would just like to note that according to Alaska Gold and the injunction pending appeal motion briefing, wetlands work was suspended over the summer and for 90 days and that wetlands work will resume on October 11th. Thank you, Counsel. Thank you very much, Your Honor. Bearing Strait versus U.S. Army Corps of Engineers is submitted.
judges: Fletcher, Kleinfeld, Gould